IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM. ACT. NO. 1:21-cr-62-TFM-B |
| | ) | |
| DANIEL ERIC CORONA and | ) | |
| GILBERTO GONZALEZ-GONZALEZ | ) | |

## MEMORANDUM OPINION AND ORDER

On April 29, 2021, the Grand Jury for the Southern District of Alabama indicted the defendants, Daniel E. Corona ('Corona') and Gilberto Gonzalez ("Gonzalez"). Count 1 of the Indictment alleges conspiracy to possess with intent to distribute approximately 16 kilograms of cocaine and Count 2 of the Indictment alleges possession with intent to distribute approximately 16 kilograms of cocaine. *See* Doc. 13. The Court previously denied the *Opposed Motion to Suppress Evidence* (Doc. 53), the *Motion to Adopt and Join Motion to Suppress* (Doc. 68), the *Opposed Motion to Sever* (Doc. 54), and the *Motion for Relief from Prejudicial Joinder* (Doc. 69) by text orders noting a written opinion would follow. *See* Docs. 74, 79.

The Court reviewed the four motions, the United States two responses (Docs. 65, 66, 72), Defendant Gonzalez' reply (Doc. 73), and the post hearing briefing (Docs. 77, 78). The Court convened an evidentiary hearing on August 5, 2021. Based on the evidence presented to the Court, arguments of the parties, and the relevant law, the motions to suppress (Docs. 53, 68) are **DENIED**.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

The facts of the case are essentially not in dispute as the encounter was recorded and a copy of the video and audio was presented to the Court during the suppression hearing. The crux of the Defendant's argument is that the officer lacked probable cause for the traffic stop and the traffic

stop was unreasonably lengthened beyond the scope of the original traffic stop.

On Monday, January 25, 2021, Baldwin County Deputy Sheriff Jason Kolbe ("Kolbe") sat in his patrol car monitoring northbound traffic at mile marker 35 on Interstate 65. Kolbe saw a northbound, white, Ford F650 flatbed truck crest the hill and dramatically slow to roughly 50 mph even though the posted speed limit was 70 mph. Deputy Kolbe became suspicious because the driver continued to drive slowly well past him. Kolbe pulled onto I-65 northbound to further investigate and saw the truck swerve across the solid white line of the right lane – also called the fog line. Kolbe put on his blue lights which in turn activated the dash camera. Kolbe testified that crossing the fog line violates Alabama law and was an indication to him the driver may be distracted, too tired to safely drive, or under the influence of some substance which is dangerous in any event. Kolbe felt crossing the fog line was particularly dangerous in this instance because the lane of travel at the point of the initial fog line violation was slightly deeper than the left lane because of resurfacing and had the driver overcorrected he might have had an accident. The video confirms that the truck crossed the fog line again shortly before Kolbe pulled the truck over near mile marker 38. Kolbe has an extensive background and training in commercial trucking, narcotics interdiction, and investigations. Kolbe drew several conclusions from his training and experience as he got out of his car and went toward the passenger side of the truck.

First, the truck is what Kolbe terms a "hotshot" truck and was itself suspicious. A hotshot truck, according to Kolbe, is one larger than a pickup but smaller than a semi and typically is used to make intrastate deliveries. The truck was in Alabama (interstate rather than intrastate) but had Texas plates and the truck bed was rusty, all of which is inconsistent with the typical legitimate hotshot. The bed of the truck held a large wooden box which was poorly strapped down. Kolbe testified that the shabby strapping is inconsistent with a legitimate hotshot loads inasmuch as

Department of Transportation (DOT) Inspectors check the security of loads. At this point, Kolbe from his training and experience[1] suspected the truck was engaged in some illegal activity and the box was likely a cover load. The driver opened the passenger side door after Kolbe knocked on the passenger side door. Kolbe told the driver, Gonzales, why he pulled him over and asked for the cab card. According to Kolbe, a cab card is an item commercial truckers carry in the normal course of business and would have readily available. A cab card consists of the vehicle registration, copies of the bill of lading, and proof of insurance. As Kolbe stood at the passenger door, he saw Corona was laying in the sleeper compartment in the rear of the truck while he, Kolbe spoke to Gonzales. Gonzales had no idea where to find the cab card. Kolbe's suspicions grew because a cab card is something legitimate drivers keep handy for instances such as the one at hand. Corona then told Gonzales where to look for the cab card. Kolbe said his suspicions grew further because both Corona and Gonzales appeared to be more nervous than a driver pulled over a typical traffic offense. In fact, Kolbe saw Corona was so nervous he could see the throb of the carotid artery in Corona's neck. Gonzalez said the two were traveling from Houston to Atlanta and that he had driven the entire way from Houston while Corona slept. Gonzalez also told Kolbe that Corona did not have a commercial driver's license ("CDL"). Kolbe began to suspect the illegal activity afoot was drug related because Houston and Atlanta are two large source cities for narcotics and from his training and experience Kolbe knew legitimate team drivers each hold a CDL. Kolbe became more certain drug trafficking was underway when Gonzalez told him he did not know the load contents because legitimate carriers would know the contents of their load. Kolbe went to his cruiser to give them time to produce the cab card information and to run their

---

[1] In addition to his law enforcement experience, Kolbe's family history includes involvement in the commercial trucking industry.

licenses.

Ultimately Gonzalez and Corona gave Kolbe several documents which were supposedly related to their trip and its purpose. The company name and DOT information on the door of the truck said, "Pure Power Logistics" but the papers given to Kolbe related to a company called Cheetah Express. The truck's tag was issued to Jesus Martinez with no reference to a company name. The insurance documents for the truck pertained to a company named Cheetah Logistics but the insurance expired in 2014. In addition, the documents contained several blank bills of lading. Alabama is a state which requires motor vehicles to carry liability insurance. During the entire traffic stop, neither Gonzalez nor Corona were able to provide proof of insurance or any documents which would allay any reasonable concerns that the truck or its' load were not stolen goods. Additionally, approximately five minutes into the traffic stop, Kolbe invited Gonzalez to accompany him back to the police vehicle while he completed a records check. Gonzalez agreed, but asked to first to a walk-around safety inspection of the vehicle. Kolbe also noticed that Gonzalez did not perform standard checks most truck drivers perform during an inspection. At this point, Kolbe concluded Gonzalez and Corona were involved in a crime which was most likely either narcotics trafficking or stolen goods. The bill of lading which most closely corresponded to the date of the traffic stop listed an address in Atlanta, Georgia as the destination for the delivery of an engine and transmission. While he was in his cruiser, Kolbe put into Google Earth the delivery address which pulled up a photo of a fruit and vegetable market.

Approximately 17 minutes into the stop, back up arrived with a narcotics canine and 20 minutes into the stop, Kolbe asked for and received consent from Gonzalez to search the truck and the load. During the search, Kolbe noticed an area in the rear sleeper area that had an access panel that appeared to have been pried. He asked both Gonzalez and Corona if they had keys for the

rear passenger door and they said they did not know. As such, Kolbe found a screwdriver to open the door. Inside the compartment, Kolbe found a black duffel back containing what appeared to be approximately 16 kilograms of cocaine. Before removing the narcotics, Kolbe took the narcotics canine from his cruiser and had him sniff the outside of the truck. The canine alerted for the presence of narcotics on the door and floorboard where the officers had located the duffel bag. The officers towed the truck and arrested the defendants for narcotics trafficking.

Both defendants filed their respective motions to suppress and motions for separate trials. *See* Docs. 53, 54, 68, 69. The Government filed its omnibus responses. *See* Docs. 65, 66, 72. Defendant Gonzalez filed his reply. *See* Doc. 73. The Court held an evidentiary hearing on the matter on August 5, 2021. The Court ruled on the motions for separate trial that same date. *See* Docs. 74. The Court permitted supplemental briefing on the suppression issues by the Defendants. *See* Docs. 77, 78. On August 16, 2021, the Court entered a text order denying the motions to suppress with a written opinion to follow.

Subsequently, Defendant Corona entered a plea of guilty as to Count One of the Indictment and was adjudicated guilty on October 6, 2021. *See* Doc. 109.

## II.   LAW AND DISCUSSION - SUPPRESSION

**A.   Standing**

It is well established that for a defendant to move to suppress evidence, he must have standing. *United States v. Eyster*, 948 F.2d 1196, 1208-09 (11th Cir. 1991). A defendant has the burden of showing standing under the Fourth Amendment. *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997). To claim the protection of the Fourth Amendment, an individual must have a "reasonable expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). A defendant's expectation of privacy must be "personal[]"

and "reasonable," and it must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998) (internal quotation marks omitted). That said, "[s]tanding does not require an ownership interest in the invaded area." *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011) (noting that the Supreme Court has recognized that an overnight guest in a home has a legitimate expectation of privacy in that home).

An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (citing *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006). Courts assess on a case-by-case basis the standing of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control. *Oliver v. United States*, 466 U.S. 170, 191 n. 13, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). Moreover, the Eleventh Circuit has held that where a defendant is neither the owner nor the lessee of the place searched, in order to contest a search, he must "demonstrate a significant and current interest in the property at the time it was searched." *United States v. Miller*, 387 F. App'x 949, 951 (11th Cir. 2010) (citation and quotation omitted).

Here, Defendant Corona failed to present any credible evidence at the suppression hearing or at the scene that he was anything other than a passenger in the truck. The Eleventh Circuit previously held that "a passenger in a private car who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car." *United States v. Lee*, 586 F.3d 859, 864 (internal modifications and citation omitted); *see also United States v. Cooper*, 133 F.3d 1394, 1398 (11th

Cir. 1998) ("A passenger usually lacks a privacy interest in a vehicle that the passenger neither owns nor rents, regardless of whether the driver owns or rents it."). Co-conspirators and codefendants have been accorded no special standing. *Alderman v. United States*, 394 U.S. 165, 172, 89 S. Ct. 961, 965, 22 L. Ed. 2d 176 (1969). At no point during the search did Gonzalez or Corona do anything to object to the search. Indeed, Gonzalez gave Kolbe consent to search the truck. Neither Gonzalez or Corona did anything to revoke the consent given by Gonzalez, nor did either claim ownership over the vehicle or its contents. As such, Corona's motion to suppress fails for want of standing. The Court finds from the evidence that Kolbe was never given any definitive, credible information to establish who is the owner of the vehicle or the cover load.

**B.      Lawfulness of the stop.**

Even if Corona has standing to contest the search, the search still passes Constitutional muster as to both defendants. The central issue before the court raised by Corona and Gonzalez is whether the initial stop of the defendants contravenes the Constitutional prohibition against unreasonable searches and seizure. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Warrantless searches and seizures are per se unreasonable unless an exception applies. *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 1716, 173 L.Ed.2d 485 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L.Ed.2d 576 (1967)). A traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L.Ed.2d 660 (1979). A traffic stop is a constitutional detention when it is justified by reasonable suspicion under *Terry*, 392 U.S. 1, 88 S. Ct. 1868 or probable cause to believe a traffic

violation has occurred under *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L.Ed.2d 89 (1996).  *See United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003); *United States v. Purcell*, 236 F.3d 1274, 1277 n. 5 (11th Cir. 2001).  To determine whether probable cause or reasonable suspicion has been met, the Court must determine whether the officer's actions were reasonable.  *See Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 1661-62, 134 L. Ed. 2d 911 (1996).

The Court finds Kolbe credible when he testified that he saw the truck cross the fog line twice.  The video of the traffic stop shows one of the two times the truck crossed the fog line.  Defendants assert that crossing the fog line is not a violation of law and therefore the basis for pulling the truck over was not legitimate.  The Court disagrees.

Ala. Code § 32-5A-88 states: "Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply: (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  ALA. CODE §32-5A-88(1).  The statute in question does not specifically reference the fog line.  However, the Court finds it credible that Kolbe believed it to be a traffic infraction.  Further, even if crossing the fog line were not a violation of Alabama law, when, as here, there is no obvious reason to cross the fog line, a reasonable officer could surmise as Kolbe did that the driver may be under the influence, drowsy, or distracted which are all dangerous for both the motoring public and the driver.  *See* ALA. CODE § 32-6-49.3(21)(b) (Reckless driving includes improper or erratic traffic lane changes); ALA. CODE § 32-5A-191(a) (Driving impaired is a violation of law).  The facts and circumstances of this stop verified Kolbe's concern that the driver might be drowsy inasmuch as the truck had Texas plates.  Gonzalez confirmed Kolbe had

valid reason for concerns about drowsiness when Gonzalez said he had driven all night from Houston to Alabama.

As noted by the Government, the Eleventh Circuit has held on numerous occasions that pulling over a vehicle for crossing the fog line is valid. *See, e.g., United States v. Esquivel*, 805 F. App'x 845, 846 n.1 (11th Cir. 2020) (citing § 32-5A-88 and noting that "[t]he Alabama Code provides for moving violations when drifting over lanes"); *United States v. Benitez*, 541 F. App'x 961, 963 (11th Cir. 2013) (holding that officer had probable cause to believe defendant violated § 32-5A-88(1) by crossing over fog line "at least twice" and that driver may be impaired in violation of Ala. Code § 32-5A-191(a)); *United States v. Sierra*, 501 F. App'x 900, 903 (11th Cir. 2012) (holding that an officer had probable cause to stop a truck that had "cross[ed] over the highway fog line several times, which is a traffic violation" under § 32-5A-88.).[2]

Furthermore, the stop would meet Constitutional muster without the Alabama traffic law inasmuch as Kolbe <u>believed</u> Alabama law allowed him to stop Gonzalez for crossing the fog line. *See Heien v. North Carolina*, 574 U.S. 54, 135 S. Ct. 530, 190 L. Ed. 475 (2014). In *Heien*, the United States Supreme Court examined the question of "whether reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition" and determined that it could. *Id*. at 60, 135 S. Ct. at 536.

Finally, this precise issue was recently upheld on appeal in a case from this same court. *See United States v. Rivas*, Civ. Act. No. 1:16-cr-272-KD, 2017 WL 957387, 2017 U.S. Dis. LEXIS 34526 (S.D. Ala. Mar. 10, 2017), *aff'd* 746 F. App'x 826 (11th Cir. 2018). The Eleventh

---

[2] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

Circuit stated "the officer's conclusion that [defendant] violated § 32-5A-88(1) by repeatedly breaching the fog line—in the absence of settled authority on the issue—was objectively reasonable…even if the officer were incorrect in his interpretation of the statute, the initial traffic stop did not violate the Fourth Amendment." *Rivas*, 746 F. App'x at 828 (citing *Heien*).

Next, Corona and Gonzalez further assert Kolbe unconstitutionally prolonged the traffic stop. *See Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). The Eleventh Circuit recently addressed *Rodriguez* in two cases – one published and one unpublished opinion. *See United States v. Campbell*, 912 F.3d 1340 (11th Cir. 2019) and *United States v. Burwell*, 763 F. App'x 840 (11th Cir. 2019). In *Campbell*, the Eleventh Circuit held that the proper standard emanating from *Rodriguez* is that "a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes. *Campbell*, 912 F.3d at 1353. "That is, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." *Id*. The Eleventh Circuit also noted that *Rodriguez* still permits an officer to conduct the "mission" of the traffic stop and attend to related safety concerns. *Burwell*, 763 F. App'x at 844 (quoting *Rodriguez*). "That mission or purpose often includes checking the driver's license, attending to safety concerns, searching for outstanding warrants against the driver, and inspecting the vehicle's registration and proof of insurance." *Id*.

As noted *supra*, Kolbe had probable cause to initiate the *Terry* stop when he witnessed the truck cross the fog line. He also did not <u>unlawfully</u> prolong the stop due to his investigation regarding lack of registration, insurance and ownership of the truck and the load. The perceived traffic infraction was ample justification for Kolbe to briefly stop and detain the truck and its passengers. After the stop began, neither Gonzalez nor Corona had documents to show the truck

and the load were not stolen. The ownership and insurance questions were not resolved before the discovery of the drugs through a consent search. The questions were still not resolved before a trained narcotics dog which Kolbe had in his car at the outset of the stop alerted on the drugs. A positive alert by a trained canine establishes probable cause for a search of the vehicle. The evidence indicates that to the extent there was a delay, Gonzalez and Corona are responsible for the delay because they did not show proof of insurance or ownership of the truck or its load. The totality of the circumstances show Kolbe developed reasonable suspicion that Gonzalez and Corona were involved in either possession of stolen property or narcotics trafficking.

C.   **Consent**

Gonzalez gave Kolbe consent to search the truck and neither Gonzalez nor Corona did anything to revoke the consent. "A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'" *Purcell*, 236 F.3d at 1281 (citation omitted). In assessing the voluntariness, the Court looks at the totality of the circumstances. *Id*.

The video confirms Gonzalez understood the request and voluntarily consented to the search. The Court finds no indication that the consent was anything other than an essentially free and unconstrained choice. There was no threat of violence, force, or even verbal abuse. Rather, the conversation was generally low-key and profession. In fact, Kolbe even permitted the defendant to go to the tree line cover in order to relieve himself.

D.   **Dog alert**

Kolbe testified that prior to moving the cocaine, he ran his narcotics canine around the truck. The dog alerted to indicate the presence of narcotics. Regardless of whether consent was a valid search basis, the dog alert would justify the search which ultimately revealed the cocaine hidden inside the truck. *Florida. v. Harris*, 568 U.S. 237, 248, 133 S. Ct. 1050, 1058, 185 L. Ed.

2d 61 (2013). Kolbe said that if he had not obtained consent, he would have had his dog sniff the truck.

### III. LAW AND DISCUSSION – SEVERANCE

While the Court would have originally issued a more substantive opinion on the issue of severance, but because Defendant Corona pled guilty, the only defendant that had a jury trial was Defendant Gonzalez. As such, the *Opposed Motion to Sever* (Doc. 54), and the *Motion for Relief from Prejudicial Joinder* (Doc. 69) were rendered **MOOT**.

However, even if they weren't moot, the Court found that nothing presented by the Defendants in their motions or the evidentiary hearing would have resulted in the Court granting separate trials.

Fed. R. Crim. P. 8(b) is the launching point for charging multiple defendants in the same indictment. In essence, such a challenge is a two-step inquiry: (1) whether joinder is proper under Rule 8(b) followed by (2) whether joinder would be prejudicial under Rule 14 of the Federal Rules of Criminal Procedure. *See, e.g., United States v. Weaver*, 905 F.2d 1466, 1476 (11th Cir. 1990) ("The question of whether initial joinder is proper under Rule 8(b) is to be determined before trial by examination by the trial court of the allegations stated on the face of the indictment. However, whether joinder is improper based upon evidence proffered before or adduced during trial is governed by Rule 14.").

Rule 8(b) states:

> Joinder of Defendants. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

FED. R. CRIM. P. 8(b). Rule 8 is designed to promote judicial economy and efficiency and is

broadly construed in favor of joinder of defendants. *United States v. Lopez*, 649 F.3d 1222, 1233-34; *Weaver*, 905 F.2d at 1476. Thus, in the Eleventh Circuit "the rule about joint trials is that 'defendants who are indicted together are usually tried together.'" *Lopez*, 649 F.3d at 1234 (quoting *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007); remaining citations omitted). "That rule is even more pronounced in conspiracy cases where the refrain is that 'defendants charged with a common conspiracy should be tried together.'" *Id*. (quoting *United States v. Beale*, 921 F.2d 1412, 1428 (11th Cir. 1991)).

"To be sure, the rule about a joint trial in conspiracy cases is not quite ironclad." *Lopez*, 649 F.3d at 1234. However, "[t]he exceptional circumstances justifying a deviation from the rule, however, are few and far between." *Id*. This is where the Court would turn to Fed. R. Crim. P. 14(a).

The Defendants only presented arguments under Fed. R. Crim. P. 14 in their respective motions – seemingly acknowledging that they were properly joined under Fed. R. Crim. P. 8. "A Rule 14 claim assumes that the initial joinder of the defendants was proper but challenges their joint trial as unduly prejudicial." *United States v. Scrushy*, 237 F.R.D. 464, 466 (M.D. Ala. 2006) (citing *United States v. Bryan*, 843 F.2d 1339, 1342 (11th Cir. 1988)). Moreover, in the case at hand, the Court finds that the parties were not misjoined under Rule 8(b).

Therefore, the Court turns to the crux of Defendants arguments: whether joinder would be prejudicial under Rule 14. Rule 14(a) states: "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." FED. R. CRIM. P. 14(a). "When defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there

is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent a jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 938, 122 L. Ed. 2d 317; *United States v. Blankenship*, 382 F.3d 1110, 1123 (11th Cir. 2004) (quoting *Zafiro*); *see also United States v. Harris*, 828 F. App'x 611, 613 (11th Cir. 2020) (quoting *Blankenship*) ("The only two circumstances in which severance is the only permissible remedy are 'if there is a serious risk that a joint trial would [1] compromise a specific [constitutional] trial right of one of the defendants, or [2] prevent the jury from making a reliable judgment about guilt or innocence.'"). Further, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540, 113 S. Ct. at 938 (citations omitted); *see also Lopez*, 649 F.3d at 1234. "Anything that increases the likelihood of a conviction 'prejudices' the defendant in the ordinary sense of the word, but in severance law 'prejudice' is not used in the ordinary sense of the word." *Lopez*, 649 F.3d at 1234. Aside from those two exceptions articulated in *Zafiro*, "most other defendants prejudiced by a joint trial are entitled only to curative instructions." *Blankenship*, 382 F.3d at 1123.

There are situations were a severance may be warranted due to "the sheer number of defendants and charges, the differing levels of culpability, and the massive amount of evidence make it nearly impossible for a jury to sort through the evidence and issues and reliably determine the guilty or innocent of each defendant on each charge." *Lopez*, 649 F.3d at 1235 (citing *Blankenship*, 382 F.3d at 1124). However, the bar for showing that kind of prejudice is so high that only in the rarest of case can a defendant clear it. *Id*. (citations omitted); *see also United States v. Hernandez*, 921 F.2d 1569, 1580-81 (11th Cir. 1991) (collecting some of the more complex cases in which the Eleventh Circuit found that the district court did not abuse its discretion in

denying severance).

In the case at hand, the Defendants have failed to carry that heavy burden to show that they will not only be prejudiced, but rather "specific and compelling prejudice." *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997). Nothing in their statements or arguments overcomes the general presumption joint trials are "even more pronounced in conspiracy cases where the refrain is that defendants charged with a common conspiracy should be tried together." *Lopez*, 649 F.3d at 1233-34. Moreover, they provide no specifics to show that a jury would not be able to follow the Court's limiting and curative instructions. Therefore, they have not carried their burden and their motions under Rule 14 are also due denial even if not rendered moot by Defendant Corona's plea of guilty.

### IV.   CONCLUSION

For the reasons articulated above, the *Opposed Motion to Suppress Evidence* (Doc. 53 ) is **DENIED**. The *Motion to Adopt and Join Motion to Suppress* (Doc. 68 ) is **GRANTED** to the extent Defendant Gonzalez is permitted to join the motion to suppress, but **DENIED** as to the motion to suppress. Finally, the *Opposed Motion to Sever* (Doc. 54), and the *Motion for Relief from Prejudicial Joinder* (Doc. 69) are both **DENIED**.

**DONE** and **ORDERED** this 8th day of December, 2021.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE